IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.  Criminal Action No. 3:07cr154-3

ROGER CHARLES DAY, JR.,
        Defendant.

## OPINION

Roger Charles Day, Jr., has a long history of devising and executing sophisticated schemes to commit shocking levels of fraud against government entities. Indeed, after his first scheme, he was caught and sentenced to lengthy state and federal sentences. Undeterred, Day made even bigger plans to defraud the government, giving rise to the instant case. While on federal supervision, he orchestrated an intricate scheme to commit massive fraud against the Defense Logistics Agency (the "DLA"), which put the lives of numerous service members at risk for the sole purpose of furthering his own greed. In 2011, the Court sentenced Day to 1,260 months' incarceration.

Day now moves for compassionate release, asking the Court to reduce his sentence based on (1) a purported sentencing disparity and (2) alleged torture he endured while in pre-trial custody in a Mexican prison and resulting *Brady* violations. Because the factors set forth in 18 U.S.C. § 3553(a) do not support a sentence reduction even assuming Day's proffered reasons meet the extraordinary and compelling threshold, the Court will deny his motion.

### I. BACKGROUND

To put the Court's decision in proper context, one must take a holistic view of Day's criminal history and pattern of conduct.

## A. *Prior Offense Conduct*

In the 1990s, Day and his then-wife ("the Days") owned a hardware supply business that did business with various state and federal government entities. During their state-government business dealings, the Days bribed public officials to pay for products their business often never delivered, with a total loss of more than $350,000.

The Days also bribed federal employees to award them contracts to provide a Department of Defense ("DOD") component and the Department of Veteran Affairs with supplies. The Days used several business names and, in some cases, lied about the type of businesses they ran, asserting that they were a small, woman-owned business when they did not actually meet the criteria for that business type. Further, at least some of the supplies the Days provided under the contracts they received for critical military applications were inferior to what the contracts required. To circumvent legitimate inspections by a quality assurance representative ("QAR"), they created a counterfeit QAR stamp, forged QAR signatures on paperwork, and affixed the counterfeit stamps on their substandard products before mailing those products to the DOD. The Days also tried to bribe an undercover agent posing as a QAR to conceal from authorities that they had forged his signature and stamp. The total loss to the government exceeded $300,000.

Authorities arrested and charged the Days in April 1995. After they posted bond, the Days used fake passports to flee the United States. They were arrested abroad, fought extradition, and eventually returned to the United States in July 1997. Day ultimately received lengthy sentences on both state and federal charges, which included charges on not only the fraud schemes but also crimes related to the escape. He was paroled on his state charges on April 24, 2000,[1] and turned

---

[1] According to the record currently before the Court, "[d]etails regarding his adjustment to supervision [with respect to his state charges] are unknown, but he appears to have been discharged from parole on January 16, 2002." (ECF No. 599 ¶ 81.)

2

over to federal authorities to serve out his federal sentence. The Federal Bureau of Prisons (the "BOP") released Day from federal custody on December 16, 2002. Three years later, on December 15, 2005, Day "was successfully discharged" from supervision. (ECF No. 599 ¶ 83.)

### B. *Underlying Offense Conduct*

Starting in July 2004—more than a year before his federal supervision in his prior case ended—through July 2007, Day developed and oversaw another, more sophisticated scheme to defraud the federal government. This time, Day recruited co-conspirators to set up eighteen companies that concealed the true identities of the involved parties to bid on contracts for the Defense Logistics Agency (the "DLA"), a DOD component. This included using other individuals' information to set up the companies, some of whom "did not know that [their information] was being used to circumvent administrative orders." (*Id.* ¶ 54.) Day also worked with a computer programmer to help him develop a program that enabled him to "submit bids at a high volume with little manpower." (*Id.* ¶ 53.) The conspirators focused on contracts and purchase orders that did not require parts inspections at the company's place of business.

When one of the companies received a contract, Day would order parts with similar names to the required parts from a commercial and industrial parts supplier. Those parts, however, did not conform to contract specifications and "were unusable." (*Id.* ¶ 59.) Moreover, the parts were often considered "critical application items" used by military personnel in combat zones or in combat vehicles, aircrafts, and weapons systems, and they "were often not discovered until they reached the combat or repair unit in the field." (*Id.* ¶ 60.) Using a non-conforming part could jeopardize the military mission or lives of the service members, and when a technician discovered non-conforming parts, a mission may have to be called off for repairs, which could likewise endanger military personnel.

On average, Day bought items for less than 4% of the overall amount the DLA paid for the product. Day would then have the parts delivered to his co-conspirators, who would match them with the appropriate purchase order. They contracted with a separate company to ship the items to the DLA, directing the company to label and package the parts in such a way that falsely indicated the packages contained the correct parts. After shipment, the conspirators would submit invoices to the DLA that falsely represented that they had supplied the correct parts. When the DLA asked for proof that they had purchased or intended to purchase the right parts from approved manufacturers, the co-conspirators, often with guidance from Day, falsely represented that they had bought the correct parts.

When the DLA disbarred one of Day's companies from doing business with it, the conspirators would use another company they had created in its place to begin soliciting contracts using the bidding software. Over the course of the conspiracy, the DLA awarded eighteen companies at least 987 purchase orders worth more than $8.6 million, and the companies received more than $4.4 million in payments on at least 338 purchase orders. The DLA also incurred other transaction costs related to administrating the awards to Day's companies and receiving, handling, and disposing of the faulty parts Day supplied, which amounted to nearly $1.5 million. In addition, the DLA incurred nearly $280,000 in costs related to awarding the companies contracts that they did not fulfill.[2]

Day took many steps to conceal his involvement in the conspiracy. All the companies were set up in others' names, and his co-conspirators handled all communications with the DLA. His girlfriend also let him use her credit cards to buy the non-conforming parts. In mid-2005, Day

---

[2] Had Day delivered faulty parts on all the awards, the DLA would have incurred nearly $2.6 million in additional losses, which amounts to more than $11 million in total intended losses.

4

moved to Mexico and oversaw operations from there. After the government paid for the products, Day and his co-conspirators transferred the funds from U.S. bank accounts to other bank accounts, including foreign bank accounts. The co-conspirators would then route funds to Day through the foreign bank accounts; purchase gold and foreign coins; and use anonymous debit cards, cash, and other means to avoid detection. In January 2006, Day opened a certificate of deposit and personal bank account in Belize. He also had several bank accounts in Mexico and Estonia, and at some point, formed a trust corporation to try to protect his assets. When the Belizean bank became suspicious of Day's bank account, a co-conspirator opened a United States account under a false name and transferred more than $900,000 from the account in Belize. Further, Day sent more than $600,000 to an Estonian bank account.

In March 2006, Day made plans to buy gold and have others transport it to him in Mexico without being traced. Between May and November 2006, a co-conspirator bought more than $2 million in gold coins and bars from a gold dealer in Arizona and shipped it to New Jersey. The co-conspirator then brought, or tried to bring, the gold to Mexico on three different trips. In July 2006, the co-conspirator used a car modified by a separately charged defendant to hide 197 gold bars, cross the U.S.-Mexico border, and deliver the gold to Day. In September 2006, the co-conspirator tried to take a small amount of gold into Mexico to give to Day, but he was arrested and could no longer cross the border. Thus, in February 2007, the same co-conspirator again met with the separately charged defendant to hide $850,000 worth of gold bars and foreign currency in a military transport vehicle and then had a former correctional officer whom Day had met during his prior period of incarceration drive the vehicle to Day's home in Mexico.

Later, Day recruited another person to transport gold from Mexico to Canada. This person met Day's girlfriend in Mexico, who gave him 14 gold bars hidden in a phone. The individual

brought the gold to New Mexico and shipped it to Washington, where a Canadian gold dealer picked the gold up and liquidated it. Then, the dealer wired the money to Day's girlfriend, her family, and others.

### *C. The Criminal Proceedings*

The criminal and post-conviction proceedings in this case have spanned nearly two decades. In the interest of judicial efficiency, the Court focuses only on the criminal proceedings most relevant to resolving the motion for compassionate release.

On April 17, 2007, a grand jury returned an indictment charging Day with one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349.[3] Eventually, on August 19, 2008, the grand jury returned a fourth superseding indictment, which charged Day with one count of wire fraud conspiracy (Count 1); three counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2–4); three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 5–7); one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count 8); one

---

[3] The indictment also charged a co-defendant, Nathan Francis Carroll, with one count of wire fraud conspiracy, twenty-two counts of wire fraud, and six counts of aggravated identity theft. (*See* ECF No. 17.) As time went on, the government charged additional defendants in this and related cases. By the time Mexican authorities extradited Day, the Court had already sentenced all other related defendants. On November 8, 2007, the Honorable Richard L. Williams sentenced Carroll to 70 months' imprisonment for wire fraud conspiracy followed by a consecutive 24 months' imprisonment for aggravated identity theft. On April 29, 2008, Judge Williams sentenced co-defendant Gregory Allen Stewart to 51 months' imprisonment for wire fraud conspiracy followed by a consecutive 24 months' imprisonment for aggravated identity theft. On May 14, 2008, Judge Williams sentenced co-defendant Susan Virginia Neufeld to 5 years' probation for misprision of a felony. On March 27, 2009, Judge Williams sentenced a separately charged defendant, Juerg Mehr, to 5 years' probation for conspiracy to smuggle goods from the United States. On September 22, 2009, Judge Williams sentenced a separately charged defendant, Glenn M. Teal, to 90 days' incarceration for conspiracy to smuggle goods from the United States. Judge Williams reassigned Day's case to the undersigned Senior United States District Judge on January 4, 2011, shortly after Mexico extradited Day back to the United States. (*See* ECF No. 170.)

count of conspiracy to smuggle goods, in violation of 18 U.S.C. § 371 (Count 9); one count of obstruction of justice, in violation of 18 U.S.C. § 1503 (Count 10); and a forfeiture allegation.

Mexican authorities arrested Day in July 2008. "Immediately following his arrest, [Day] attempted to flee from law enforcement on foot." (ECF No. 599 ¶ 78.) From July 2008 through December 2010, Mexican authorities detained Day while he fought extradition to the United States. (*See* ECF No. 210-1.) While detained in Mexico, he also tried to bribe a correctional officer at least twice. (ECF No. 599 ¶ 78.) In addition, Day alleges that between August 2009 and December 2010, when Mexican authorities held him at Villa Aldmada, he and numerous other prisoners facing extradition "were subject to acts of egregious physical and mental torment amounting to torture, primarily as a means of attempting to coerce or influence them to waive their rights and protections found in the Treaty of Extradition between Mexico and the United States." (ECF No. 596. at 3.)

Authorities extradited Day back to the United States in December 2010 to face trial on Counts 1, 2, 3, 4, 8, and 9 of the fourth superseding indictment.[4] (*See* ECF No. 210-1.) The Court held a jury trial from August 15, 2011, through August 25, 2011. The jury found Day guilty of Counts 1, 2, 3, 4, 8, and 9. The Court scheduled the sentencing in this case for December 15, 2011. According to information received by the government, Day planned to escape custody during the trial and sentencing phases of the proceedings.

The Presentence Investigation Report calculated the Guidelines range for Counts 1, 2, 3, 4, and 8 as 240 months' incarceration on each of those five counts and 60 months' incarceration on Count 9. On December 15, 2011, the Court sentenced Day to a total of 1,260 months'

---

[4] After sentencing, the government moved to dismiss all indictments preceding the fourth superseding indictment against Day and Counts 5, 6, 7, and 10 of the fourth superseding indictment, (ECF No. 398), which the Court granted, (ECF No. 400).

incarceration, which comprised a 240-month sentence each on Counts 1, 2, 3, 4, and 8, and a 60-month sentence on Count 9, all consecutive. In other words, although lengthy, the Court imposed a Guidelines sentence.

Since his sentencing, Day has vigorously, but unsuccessfully, challenged his conviction and sentence in various ways. Most relevant here, the United States Court of Appeals for the Fourth Circuit affirmed both the procedural and substantive reasonableness of Day's sentence on November 29, 2012. (*See* ECF No. 413, at 25–31.) The Fourth Circuit acknowledged "the court's detailed consideration of the [18 U.S.C.] § 3553(a) factors." (*Id.* at 26.) Notably, the Fourth Circuit also rejected Day's argument "that the trial court's sentence failed to account for alleged prison abuses he suffered in Mexico," explaining that the record established that the undersigned did not believe that the experience was as bad as Day described, but that "what happened to him in Mexico [did] not outweigh what he did in his criminal behavior in this case." (*Id.* at 26–27.) The Fourth Circuit, therefore, concluded that the Court "had a reasonable basis for its sentence notwithstanding" any abuse Day may have suffered. (*Id.* at 27.) Further, in 2020, he filed a motion for compassionate release based on the COVID-19 pandemic and his medical conditions, which the Court denied because he had not established an extraordinary and compelling reason to reduce his sentence, and the § 3553(a) factors did not support his release. (*See* ECF No. 585; *see also* ECF No. 592 (Fourth Circuit opinion affirming the Court's order denying his compassionate release motion).) Day's second motion for compassionate release represents his latest effort to challenge his sentence.

Day is currently incarcerated at Federal Correctional Institution Butner Medium I and has a projected release date of January 19, 2097.[5]

---

[5] *Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/.

## II. LEGAL STANDARD

Generally, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Pursuant to § 3582(c)(1)(A)(i), however, a district court may reduce a criminal defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the court "finds that . . . extraordinary and compelling reasons warrant such a reduction." Before the First Step Act, courts could only consider compassionate release motions if they were initiated by the BOP. *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020), *superseded by regulation as recognized in United States v. Davis*, 99 F.4th 647 (4th Cir. 2024). But today, § 3582(c)(1)(A) empowers a defendant to file his own motion for compassionate release so long as he first "fully exhaust[s] all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf" or waits thirty days "from the receipt of such a request by the warden of [his] facility, whichever is earlier."

Although Congress did not define extraordinary and compelling reasons in § 3582(c)(1)(A), "the Sentencing Commission . . . addressed the issue in a policy statement, United States Sentencing Guideline § 1B1.13," which provided the BOP with several categories of "extraordinary and compelling reasons" to consider. *McCoy*, 981 F.3d at 276. For years following the passage of the First Step Act, the Sentencing Commission did not update § 1B1.13 to account for motions filed by defendants, meaning the policy did not bind the courts when presented with a defendant's motion for compassionate release. *Id.* at 281–82, 284. A court, therefore, remained "empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise." *Id.* at 284 (quoting *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020)) (alteration and emphasis in original).

9

The Sentencing Commission, however, has amended the Sentencing Guidelines to address compassionate release motions brought by defendants and expanded the list of extraordinary and compelling reasons that support a sentence reduction. U.S.S.G. § 1B1.13. The reasons fall into several categories: (1) the defendant's medical circumstances, *id.* § 1B1.13(b)(1); (2) the defendant's age, *id.* § 1B1.13(b)(2); (3) the defendant's family circumstances, *id.* § 1B1.13(b)(3); (4) whether the defendant was the victim of certain abuse while in custody, *id.* § 1B1.13(b)(4); (5) "any other circumstance or combination of circumstances that, when considered by themselves or together with any" of the preceding categories, "are similar in gravity," *id.* § 1B1.13(b)(5); and (6) an unusually long sentence if the defendant meets certain requirements, *id.* § 1B1.13(b)(6). The defendant must also establish that he "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(a)(2). These amendments took effect on November 1, 2023.

### III. DISCUSSION

#### A. Administrative Exhaustion

The government contends that Day has not exhausted his administrative remedies. Administrative exhaustion "is a non-jurisdictional claim-processing rule" and can, therefore, be "waived if it is not timely raised." *United States v. Muhammad*, 16 F.4th 126, 129–30 (4th Cir. 2021) (citing *United States v. Marsh*, 944 F.3d 524, 529 (4th Cir. 2019)). Where, as here, the government raises the issue, the Court must consider whether the defendant satisfied the exhaustion requirement.

The government contends that Day "did not properly submit an administrative request to the Butner Reduction in Sentence Coordinator." (ECF No. 604, at 12.) It also contends that Day's administrative request filed in 2020 before his first motion for compassionate release included

10

"many . . . claims . . . [that] are reiterated in the current motion" but that his current motion also includes "additional claims that have not been presented to BOP for administrative review." (*Id.*)

Day, however, filed a written request to the "Reduction in Sentence Coordinator" on May 9, 2024, and included a copy of that request with his motion. (*See* ECF No. 596-1, at 2.) Although BOP records do not reflect this submission, it appears Day made the request as required based on the evidence before the Court. The request is not particularly detailed, but the Fourth Circuit has held that courts may not "impos[e] an issue exhaustion requirement in the compassionate release context" that limits a defendant's proffered extraordinary and compelling reasons to the grounds he raised in his request to the warden. *United States v. Ferguson*, 55 F.4th 262, 269 (4th Cir. 2022). Further, although it is not clear whether the warden denied his request or did not respond to it, either outcome satisfies the administrative exhaustion requirement. *See* 18 U.S.C. § 3582(c)(1)(A). The Court, therefore, will turn to the merits of Day's motion.

### *B. Analysis*

Day makes various arguments under two broad categories: (1) a sentencing disparity he believes exists and (2) his torture in Mexico and purported *Brady* violations. As an initial matter, at least some of his arguments appear more appropriately considered in a motion under 28 U.S.C. § 2255, and therefore, the Court cannot review them in a motion for compassionate release. *See Ferguson*, 55 F.4th at 270 ("Because § 2255 is the exclusive method of collaterally attacking a federal conviction or sentence, a criminal defendant is foreclosed from the use of another mechanism, such as compassionate release, to sidestep § 2255's requirements.") Moreover, several of the arguments have already been considered and rejected by the Court, and the Court declines to permit Day to take yet another bite at the apple when it has already resolved those issues. Ultimately, however, the Court need not tick through the merits of Day's proffered

extraordinary and compelling reasons. Even assuming his arguments, either individually or in combination, rise to the level of extraordinary and compelling, the Court cannot reduce his sentence because doing so would actively undermine the goals of sentencing. *See* 18 U.S.C. § 3582(c)(1)(A) (requiring a court to also consider "the factors set forth in section 3553(a)").

Section 3553(a) requires that a district court impose a sentence that is "sufficient, but not greater than necessary," to achieve certain goals.[6] *Id.* § 3553(a). In his motion, Day highlights that he has not had any disciplinary infractions while incarcerated. He has also completed more than 70 education courses, an 18-month faith-based anti-recidivism program, and "the voluntary, year-long, residential treatment program designed to help offenders improve their rational thinking skills." (ECF No. 596, at 26.) A Challenge Program Coordinator previously attested to his "willingness to examine areas of his life which needed improvement" and supported a sentence reduction. (ECF No. 596-6, at 2–3.) That letter, however, is from 2014 and apparently was solicited to support his unsuccessful § 2255 motion, and therefore, has limited persuasive value at this stage. Day also points out that the BOP has placed him in a lower-security facility given his recidivism risk and custody classification. Further, Day filed a False Claim Act whistleblower

---

[6] Specifically, the Court has considered the record pertaining to (1) the defendant's sentence relative to the nature and circumstances of his offense; (2) his personal history and characteristics; (3) the need for a sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence; (5) the need to protect the public from further crimes of the defendant; (6) the need to provide rehabilitative services; (7) the kinds of sentences available; (8) the applicable guideline sentence; (9) pertinent policy statements; (10) the need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct; and (11) the need to provide restitution to the victims. *See* 18 U.S.C. § 3553(a)(1)–(7).

lawsuit in this Court related to alleged fraud by DOD contractors and employees. *See United States ex rel. Day v. Boeing*, No. 3:23cv371 (E.D. Va., filed June 7, 2023).[7]

Day also contends that his sentence is unusually long and amounts to a sentencing disparity. He posits that

> the failure to reduce [his] sentence will undermine the respect of the law and sentencing, in that his 105-year term of maximum incarceration for these crimes shocks the conscience and is so removed from offenses and the loss amount, however calculated, that it fosters an understandable sense of skepticism of the judiciary, the Department of Justice, and our federal criminal justice system.

(ECF No. 596, at 28.)

The Court does not discount the steps that Day has taken while in prison to better himself, and it hopes these classes and programs have had the positive effect on him that he purports they have. But when the Court denied his first motion for compassionate release, it concluded that reducing his sentence would not serve the goals of sentencing considering the need for the sentence to "reflect the seriousness of the offense committed, promote respect for the law, and protect the public from further crimes of the defendant." (ECF No. 585, at 5); *see also* 18 U.S.C. § 3553(a)(2)(A), (C). It explained that his

> elaborate conspiracy involved several codefendants and the creation of numerous shell companies. His conspiracy caused the Department of Defense to lose over $11 million. To make matters worse, Day initiated this conspiracy after previous convictions for similar conduct. Day's recidivism shows that his previous prison sentences did not promote respect for the law. Nor did they protect the public from his unmitigated greed.

(ECF No. 585, at 5.) Even taking into account Day's post-sentencing conduct, these conclusions remain true today. Given that Day continues to move for post-conviction relief, however, a few points merit additional explanation at this stage.

---

[7] The Court dismissed that case on the government's motion, though Day has requested additional relief.

13

The Court imposed a significant sentence with strong justification for it. Day's sentence is long, but his crimes were egregious. He has shown a pattern of developing and executing elaborate schemes to defraud the government, involving those around him in the scheme, and then fleeing the country or trying to escape. *See* 18 U.S.C. § 3353(a)(1), (2)(A). But unlike other defendants who might have taken the first set of federal and state sentences as an opportunity to show remorse for their crimes and rehabilitate themselves, Day got bolder. Without even waiting until he was off federal supervision for his first fraud scheme, he masterminded and executed an even more detailed and sophisticated fraud that drew in numerous other people, bilked millions from the federal government, and most significantly, put the lives of service members and United States citizens as risk. He then hid in Mexico for years and took substantial steps to conceal his involvement in the fraud. Moreover, Day has shown a repeated pattern of fleeing the country to avoid responsibility, and even after his trial, apparently planned an escape from custody.

In other words, this case demonstrates a need for heightened specific deterrence, and, regardless of what post-sentencing conduct he has engaged in, Day poses a greater risk to the public than most if released early. *See* 18 U.S.C. § 3553(a)(2)(B)–(C); U.S.S.G. § 1B1.13(a)(2). Further, far from reflecting a massive sentencing disparity, his within-Guidelines sentence—which mirrors the congressionally approved statutory maximum for each count of conviction—reflects a reasonable and necessary sentence given the individual circumstances of this case. *See* 18 U.S.C. § 3553(a)(3). And, if there was any doubt, the Fourth Circuit has already affirmed the reasonableness of that sentence. (*See* ECF No. 413.) In other words, his post-sentencing conduct and other arguments do not outweigh the considerations the Court accounted for when imposing the sentence here, and 1,260 months' imprisonment remains the appropriate sentence in this case.

Finally, Day characterizes a statement the Court made in 2011—that Day "would think of his next scheme before sunset" if released—as "very damaging." (ECF No. 605, at 6–7.) He contends that "[m]any sunsets have come and gone since December 15, 2011, and [he] has neither schemed nor put any scheme into action." (*Id.* at 7.) But, as far as the Court can tell, he has not put any scheme into action precisely because he has been in prison. Rather than counseling in favor of a sentence reduction, Day's decision not to reoffend while in prison, when considered against his quick recidivism in 2004 and the details of the scheme itself, reinforces that Day's lengthy sentence both deters his criminal conduct and protects the public from further crimes. *See* 18 U.S.C. § 3553(a)(2)(B)–(C).

## IV. CONCLUSION

In sum, regardless of any extraordinary and compelling reasons Day might have demonstrated, the § 3553(a) factors weigh against reducing his sentence. The Court, therefore, will deny his motion for compassionate release.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record and to the United States Probation Office, Richmond Division.

Date: 14 July 2025
Richmond, VA

/s/ 
John A. Gibney, Jr.
Senior United States District Judge